UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                            )
UNITED STATES OF AMERICA                    )
                                            )
                                            )
                                            )
            v.                              )    Criminal No. 13-10077-DJC
                                            )
RAYMOND JEFFREYS,                           )
                                            )
            Defendant.                      )
                                            )
_____ )

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                    June 30, 2015

**I.    Introduction**

Defendant Raymond Jeffreys ("Jeffreys") has moved to suppress all fruits of the search of an automobile driven by Jeffreys on January 18, 2012. D. 345. Having considered the motion (and supporting memorandum, D. 345), the government's opposition, D. 386, the evidence (including testimony and exhibits, Exhs. 1-15) presented at the evidentiary hearing, D. 397, and post-hearing briefing, D. 396-1, the Court DENIES the motion. Accordingly, the Court makes its findings of fact and legal analysis below.

**II.   Findings of Fact**

These findings are based upon the testimony of Boston Police Officer Corey Franklin and Massachusetts State Trooper William Kenney who testified at the suppression hearing and the exhibits introduced at that hearing.

### A. Trying to Locate Jeffreys

Trooper Kenney, previously assigned to the Violent Fugitive Apprehension Section of the State Police, testified about searching for Jeffreys. As of September 2011, Jeffreys had two outstanding state warrants: one for a parole violation (on an underlying assault and battery/dangerous weapon (firearm) charge out of Suffolk Superior Court); and one for drug possession out of Dorchester District Court. Exh. 10 at 1. Around the same time, Kenney began an investigation to locate and arrest Jeffreys. Kenney began by gathering information about Jeffreys and speaking with two of his parole officers. The parole officers informed him that they believed that Jeffreys was in the prostitution business and that he had a girlfriend, Jacquelyn Lungelow, who lived in the Bromley-Heath housing complex, 267 Centre Street in Jamaica Plain, but had vehicles registered at her mother's address in Marshfield. To locate Jeffreys, Kenney focused his search on finding Lungelow.

The two cars registered to Lungelow were a black Mazda and a 2006 Dodge Magnum station wagon. Between September 2011 and January 2012, Kenney conducted surveillance near Lungelow's Bromley-Heath residence and her mother's in Marshfield in an attempt to locate Jeffreys. He did not observe Lungelow or Jeffreys until the January 18th incident described below. (Although on November 2, 2011, Kenney learned that Lungelow was booked on a flight from Las Vegas to Boston, he later determined that she had checked in for the flight, but did not board it and he was unable to find out if Jeffreys was with her at the time).

In addition to information from the parole officers and the Registry of Motor Vehicles about Lungelow's vehicles, Kenney received information about them from the Cambridge Police Department. He learned from officers in that department that Jeffreys had previously been arrested in Cambridge in or about July 2010 and that at the time of his arrest, Lungelow was with

him and she was driving a rental car. During that arrest, Jeffreys gave a false name and, during transport, also broke his cell phone and purposefully damaged the memory card in the phone. Kenney, who had previously been assigned to the auto theft task force, conducted a "backtrack history" of the Mazda registered to Lungelow and discovered that the vehicle had been previously towed and impounded in Georgia. After the impounding, Lungelow showed up to get some personal belongings out of the vehicle. The tow company found a hide in the vehicle containing numerous female drivers' licenses. The backtrack history also revealed that the car had previously been involved in an accident in New York and the operator at that time had a criminal record that included an October 2011 arrest for prostitution involving minors in Pennsylvania. The GPS on the Mazda also revealed that it had traveled up and down the East Coast. The Mazda was repossessed on September 26, 2011. Thereafter, as to vehicles, Kenney focused on the Dodge Magnum, which was also registered to Lungelow.

Starting in November 2011, Kenney saw queries from other MA police departments about the Dodge Magnum. These queries indicated to Kenney that this vehicle was back in Massachusetts. On January 13, 2012, Kenney traveled to Marshfield to see if he could find the Dodge Magnum. There, he spoke with Lungelow's mother, Deborah Jackson, at her residence. She identified herself as Lungelow's mother and informed the trooper that she had custody of Lungelow and Jeffrey's four-year old daughter. Jackson reported that she had just visited Lungelow at her Bromley-Heath residence, but she had not seen Jeffreys there, but had not gone into Lungelow's residence. Kenney kept looking for the Dodge Magnum in the Bromley-Heath area.

### B. Stop of the Dodge Magnum on January 18, 2012

During surveillance on Centre Street, on January 18, 2012 around 5:45 p.m., Kenney observed Lungelow cross the street from the Bromley-Heath complex and continue walking. Kenney began to follow her on foot, but lost sight of her. He started back to his vehicle when he spotted the Dodge Magnum traveling down Lamartine Street. Given the timing of having seen Lungelow on the street and when he saw the Dodge, Kenney did not think that Lungelow was driving the car and he could not see the driver. Kenney ran to his unmarked vehicle and started to follow the Dodge Magnum, confirmed the plate was registered to Lungelow and used the radio to ask a Boston Police unit to make a motor vehicle stop of the Dodge. The call sent out noted that the vehicle may contain Jeffreys who was a parolee with past firearms charges who may or may not be armed. The trooper kept following the Dodge until he saw a marked unit pull it over.

Boston Police Officers Franklin, Franklyn Centeio and Roger Layden, in an unmarked vehicle, activated the lights and sirens and pulled the vehicle over at 87 Lamartine Street, Exh. 1. This street is in a residential area with no parking restrictions, Exhs. 6A-D, but is in the vicinity of the Bromley-Heath complex known to the police as a high crime area.

The Dodge Magnum stopped and Kenney and the other officers approached it with guns drawn. The vehicle had dark tinted windows and the occupants took well over a minute to roll the window down in response to the command to show their hands. Kenney's attention was drawn to the driver whom he identified as Jeffreys. Jeffreys showed his hands and complied with direction to get out of the vehicle. Jeffreys, however, did not produce a license and did not give his true name; he gave the false name of Shawn Cornell. See Exh. 2. Knowing that Jeffreys

did not have a license and being aware of the outstanding warrants against him, the officers arrested Jeffreys and Boston Police officers transported him to the police station.

Kenney remained at the scene and had Lungelow step out of the vehicle. Kenney advised her of her Miranda rights. He asked her if there were any drugs or guns in the car. She indicated that there was not, but that there was a baby pitbull in the car. Kenney also asked her why she had Jeffreys drive the car, but she did not answer. The trooper also asked her why she was aiding and abetting Jeffreys when he had warrants, but she refused to respond. Kenney then arrested her for accessory after the fact for aiding a fugitive. Exh. 12. Before her transport, Kenney told her that they were going to tow the car and asked her if she had anyone who could come and take the pitbull, but she said she did not. The officers did not ask her if there was someone who could take the car. Given Lungelow's assertion that there was a pitbull in the car, the officers had animal control report to the scene to remove it. Animal control, however, found no dog in the car. Prior to animal control's search for the dog, Kenney did not look inside the car.

Because of the delay in response by Jeffreys and Lungelow when they were first pulled over and the nature of Jeffreys' criminal record, Kenney and the officers called a BPD ballistics canine to the scene to do a search of the car for guns. The canine unit conducted the search, but found no guns. The canine unit officer indicated that there were two laptop computers under the spare tire. Kenney took the computers as they were going to be towing the vehicle. He testified that in his experience when he makes a car stop and arrests all of the car's occupants, he tows the vehicle to ensure that the vehicle does not get damaged or stolen. Kenney conducted an inventory search that revealed various papers, plane tickets for Lungelow and a bail slip (for a female, Touhy Tran, who had been arrested for prostitution involving minors in New Jersey) and

5

Kenney observed trash, "hooker clothes," boots, shoes and assorted boxes of food during the search. Exh. 10 at 7. Papers found in the inventory search included a health card in Jeffreys' name and an RMV letter addressed to Corey Norris, a co-defendant in this case. Id. Three cell phones were also found in the car. Id. Kenney did not do a separate inventory list, but listed the contents of the inventory in his report. Id. A Boston Police inventory sheet was completed by Officer Centeio, another officer on the scene. Exh. 4.

As a result of finding the bail slip in the car, Kenney contacted a trooper in the vice squad, Sergeant Haseltine, who advised him to seize the documents as pertinent to an ongoing investigation. Kenney then called the tow company and put a hold on the vehicle so that it would not be returned to Lungelow if she was bailed and showed up to claim it. See Exh. 4 (noting motor vehicle hold "per order of State Police"). Haseltine then applied for search warrants for the car, the cell phones and the laptop computers. Exhs. 13A, 13B, 13C.

While Lungelow was being booked at the police station, Kenney did an inventory of her pocketbook. Kenney expected that the contents of same would be noted on the booking record (although the booking record for Lungelow admitted at the hearing, Exh. 3, does not list the contents), but Kenney also included the contents in his report (including but not limited to a license in another's name and a bus receipt showing travel from Portland to Boston on January 15, 2012). Exh. 10 at 8-9.

## III. Discussion

### A. The Police Had Reasonable Suspicion to Stop the Car

The officers had reasonable suspicion to stop the Dodge Magnum on January 18, 2012 because they had a reasonable basis to believe that Jeffreys, wanted on two outstanding warrants, would be in the vehicle. It is well settled that to conduct an investigatory stop, law enforcement

6

officers need only reasonable suspicion that criminal activity is afoot. Terry v. Ohio, 392 U.S. 1, 30 (1968). The stop must "be supported by a reasonable and articulable suspicion of criminal activity . . . and that the detention must be reasonable under the circumstances." United States v. Chhien, 266 F.3d 1, 5-6 (1st Cir. 2001). For a Terry stop, the government must show that the stop was "justified at [its] inception" and reasonable in terms of its scope. Id. at 6. If the stop was justified at its inception, the Court must further determine "whether the officer's subsequent actions were fairly responsive to the emerging tableau—the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed." Id. at 6. Moreover, a law enforcement officer's observations do "not have to be correct to constitute reasonable suspicion." United States v. Brown, 621 F.3d 48, 57 (1st Cir. 2010); see Illinois v. Wardlow, 528 U.S. 119, 125 (2000). Furthermore, "'a fact that is innocuous in itself may in combination with other innocuous facts take on added significance'" which may "culminate[ ] in reasonable suspicion." United States v. Wright, 582 F.3d 199, 212-13 (1st Cir. 2009) (quoting United States v. Ruidiaz, 529 F.3d 25, 30 (1st Cir. 2008)). Moreover, reasonable suspicion may arise "not just from the combination of facts, but from their progression. . . . reasonable suspicion can be based on 'unfolding events,' with suspicion accumulating as more innocent interpretations of the historical facts fall by the wayside." Id. (quoting United States v. Sowers, 136 F.3d 24, 27 (1st Cir. 1998)).

Kenney, a member of the fugitive task force, had been looking for Jeffreys to arrest him on outstanding warrants, including one for violation of parole on an underlying assault and battery/dangerous weapon charge involving a firearm. Information received from several sources indicated that he was often in the company of Lungelow, who was the registered owner of the Dodge Magnum. Although his surveillance of Lungelow's residence and her mother's

7

residence over the past few months had not lead to any sightings of Jeffreys, he still had reason to believe that conducting surveillance of the areas and vehicles associated with Lungelow would lead to same since they had a child together (who was living with Lungelow's mother in Massachusetts), had been together when Jeffreys was arrested in July 2010 in Massachusetts and were believed to be involved in prostitution business together. The trooper had also received information, in or about November 2011, indicating that other police departments in the Commonwealth were doing queries of the Dodge Magnum, suggesting that, even though it had been previously traveling in other areas along the East Coast, it was now back in Massachusetts. Exh. 10 at 4-5. Further, during the January 13th discussion with Kenney, Lungelow's mother mentioned that Jeffreys had wanted to spend Christmas at her house (which she had refused), also suggesting that Jeffreys may still be in the area. Exh. 10 at 5. Moreover, Kenney's observations on January 18th, which the Court credits, indicated that given the timing of seeing Lungelow on foot on the street and then seeing the Dodge drive by, the trooper had a reasonable belief that someone other than Lungelow may likely be driving the vehicle. Jeffreys questioned Kenney's credibility as to this testimony. It is true, as Jeffreys contends, D. 396-1, that Lungelow was later found in the car along with Jeffreys, but it does not answer whether Lungelow went to get the car or was picked up at some point during the time that Kenney lost sight of her on foot, particularly when Jeffreys is found, a short time later, to be driving. Kenney had more than a naked hunch that Jeffreys would be in the car stemming not just from the relationship between the two individuals and information about their traveling together and working together, but also from his sighting of Lungelow moments before. Once the stop was effected, its duration was reasonable in scope as it led first to the arrest and transport of Jeffreys

on the outstanding warrants and then to the arrest and transport of Lungelow on an aiding and abetting a fugitive charge.

### B. Search of the Car Was Not Improper

One of the exceptions to the warrant requirement for a search under the Fourth Amendment is an inventory search. Such search is non-investigatory and is executed under law enforcement's caretaking function. South Dakota v. Opperman, 428 U.S. 364, 369-71 (1976). It is an important function to catalog and track the owner's property while it is in police custody and protect the police against false claims of theft. Illinois v. Lafayette, 462 U.S. 640, 646-47 (1983). Such search must be carried out pursuant to a standardized policy. United States v. Richardson, 515 F.3d 74, 85 (1st Cir. 2008). Although discovery during such inventory search may turn out to have investigatory significance, United States v. Rodriguez-Morales, 929 F.2d 780. 787 (1st Cir. 1991), "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." Florida v. Wells, 495 U.S. 1, 4 (1990); see Rodriguez-Morales, 929 F.2d at 787 (noting that "[a]s long as impoundment pursuant to the community caretaking function is not mere subterfuge for investigation, the coexistence of investigatory and caretaking motives will not invalidate the seizure"); United States v. Coccia, 446 F.3d 233, 239 (1st Cir. 2006) (noting that the reasonableness of an impoundment of a vehicle for community caretaking purposes does not hinge on any particular factor, but upon "all the facts and circumstances of a given case") (citing Rodriguez-Morales, 929 F.2d at 785-87).

The officers' first caretaking function as to the vehicle was implicated by both the arrest of the two occupants of the car and then by Lungelow's assertion that there was a pitbull in the car. Based upon the arrest of both occupants, including Lungelow, the owner of the vehicle, the decision to tow the vehicle was a reasonable one given concerns about leaving the vehicle

9

unattended and, as discussed below, was not in violation of the Boston Police policy. The Court credits that there was no search of the car prior to the arrival and inspection by animal control. Even after that inspection revealed that Lungelow had lied about the presence of the pitbull, it remains the case that the officers had a concern about the presence of a firearm. This concern was reasonably held not just because of Jeffreys' criminal history which involved a firearm, but because Lungelow had lied about the presence of the pitbull which could be reasonably thought to be dissuade the police from looking in the vehicle.

Even if the officers had a subjective intent to conduct an investigatory search, such intent does not convert a permissible inventory search in accordance with a standardized policy into an impermissible, warrantless search. United States v. Hawkins, 279 F.3d 83, 86 (1st Cir. 2002) (rejecting the challenge to a search where the defendant alleged the inventory was a "ruse" to search for drugs because "[t]he subjective intent of the officers is not relevant so long as they conduct a search according to a standardized inventory policy"); see Coccia, 446 F.3d at 240 (concluding that there were legitimate community caretaking reasons for impoundment and no evidence that same were merely pretext). Here, even if Kenney's inventory search revealed items of an investigatory nature (clothes; papers in the names of associates) and later turned such items (or copies of same) over to a sergeant conducting a criminal investigation, it does not convert a permissible inventory search into an impermissible search.

Contrary to Jeffreys' argument, the inventory search conducted here was in accordance with the Boston Police Department policy, Exh. 5.[1] Although Jeffreys is correct that officers do not have unfettered discretion in conducting an inventory search under the policy, the policy

---

[1] To the extent that Jeffreys argues that the search that he seeks to suppress here was an impermissible search incident to arrest under Arizona v. Gant, 556 U.S. 332 (2009), the Court rejects that argument. The search that resulted in the evidence that he now seeks to suppress was the result of a permissible inventory search for the reasons discussed above.

does allow discretion to the officer as to the disposition of a motor vehicle between leaving it with someone having apparent authority to assume control of it (which, it is not disputed, was not an option);[2] park, lock and "attempt to notify the registered owner" (also not an option here where the registered owner, Lungelow, was arrested); "leave it at the side of the road with windows closed and locked, if possible, if traffic is not obstructed and arrangements can be made for its removal without undue delay"; or "have it towed for safekeeping." Exh. 5 at Section 4. Jeffreys points out that the policy further requires that the vehicle be disposed of in the second and third manner above "when there is no danger to public safety and the risk of theft or vandalism is relatively low." Id. at p. 2. This argument does not lend great support to Jeffreys' position for two reasons. First, there was credible testimony about the area being a high crime area and the decision to tow the car was made as the police were initially concerned about a firearm in the vehicle and after Lungelow indicated (falsely) that there was a pitbull in the vehicle. That is, the car itself (or its position on the street) might not have caused any danger to public safety, but the officers could not be sure that the same was true as to the contents of the car. Second, the policy also provides that even if the car is left at the scene and not towed, since the officers had custody of the vehicle, "the danger of false claims now exists" and "[t]herefore, an [i]nventory search will be performed." Id. That is, even if officers had not had the car towed (as was permissible under the policy given the facts and circumstances in this case), the policy still permitted the inventory search that was conducted here. Moreover, the policy provides that

---

[2] To extent that Jeffreys faults the officers for not asking Lungelow whether there was anyone who could come and take her car, the Court notes the following. First, the policy does not require such inquiry. Second, when asked if there was anyone was available to take the pitbull, Lungelow indicated that there was not. Given this answer (when only Lungelow, not the officers, knew no such dog existed), it is not reasonable to expect that the officers would have thought she would answer differently to any inquiry about the availability of someone to take the car.

11

such inventory search will "[w]hen circumstances and conditions permit" be conducted "at the scene PRIOR to the towing of the vehicle." Id. at 1. Such was also the case here. Although Jeffreys notes that Kenney, the state trooper who conducted the inventory search, did not complete an inventory form (Form #2012, as noted in Policy at p. 20), there was one completed by Boston Police Officer Cedeio, Exh. 4, even as Kenney noted the results of the inventory search in his report. Exh. 10.[3] Here, where the inventory search was conducted pursuant to a standardized policy and, therefore, the officer's subjective intent is not relevant, the Court concludes that the inventory search was not improper.

### C. The Results of the Subsequent Searches Were Not Fruit of the Poisonous Tree

Having concluded that the motor vehicle stop and inventory search of the Dodge Magnum were proper, the Court does not have a basis to conclude that the later seized evidence (namely that seized as result of the subsequent search warrants)[4] should be suppressed as fruit of the poisonous tree. Exhs. 13A, 13B, 13C.

### IV. Conclusion

For all of the aforementioned reasons, Jeffreys's motion to suppress, D. 345, is DENIED.

---

[3] That Kenney made note of some of the details of the bail slip found in the vehicle in his report does not convert the otherwise permissible inventory search into an investigatory one. The bail slip apparently on its face made reference to criminal activity (prostitution) and a large amount of bail (over $50,000). As the case upon which Jeffreys relies, Commonwealth v. Seng, 436 Mass. 537, 554 (2002) notes "the police need not 'blind themselves' to information visible during an inventory search; what they may not do is investigate the information [found] without obtaining a warrant." Id. That is what happened here: the items found were noted during the inventory and later search warrants for the vehicle, cell phones and laptops were then sought and received. Exhs. 13A, 13B, 13C.

[4] Jeffreys recognizes that he does not have standing to object to the search of Lungelow's handbag during her booking. His counsel urges this Court to consider the search of this handbag as evidence of the police's determination to do investigatory, not inventory, searches to gather evidence against Jeffreys. The record as to the car stop, as discussed above, belies that contention and the separate inventory of Lungelow's handbag, conducted later at the police station during her booking, does not give further support to this argument.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge